## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-35 (RC)** |
| **MICAIAH JOSEPH,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Micaiah Joseph to 60 months' incarceration – near the high end of the Guidelines range of 51 to 63 months – 3 years' supervised release, $2,000 in restitution, and a $285 special assessment.

### I.    INTRODUCTION

The defendant, Micaiah Joseph, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

1

Joseph, a 34-year-old man from Triangle, Virginia, traveled from his home in Virginia to Washington D.C. to attend the "Stop the Steal" rally near the Ellipse on January 6, 2021. After attending the rally, he donned body armor and a gas mask and made his way to the Capitol. At approximately 2:30 p.m., likely while on restricted Capitol grounds, Joseph called Senator Mark Warner's office. By approximately 3:01 p.m., Joseph was at the Lower West Terrace ("LWT") tunnel, where rioters were openly fighting with police. While inside the tunnel, the defendant participated in coordinated pushes against the police and at one point, tried to speak to officers. While pushing against officers, Joseph used the entry door to leverage himself against MPD Officer Omar Forrester and his shield. Joseph then retreated toward the entrance of the tunnel and handed his mask off to another rioter. Instead of leaving, he turned back into the tunnel and participated in another push against police. This heave-ho effort trapped MPD Officer Daniel Hodges between the crowd and one of the doorframes of the tunnel, and Officer Hodges suffered bodily injury as a result. After that collective push, Joseph finally left the tunnel.

Joseph testified at his jury trial and made several false statements under oath including that he (1) did not witness violence prior to entering the tunnel and thought the protest peaceful; (2) was not in the tunnel to cause trouble, but rather tried to protect the police; and (3) did not know he was not permitted on Capitol grounds or inside the tunnel.

For all of these reasons, and as set out in greater detail below, the government recommends

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

that the Court sentence Joseph to 60 months of incarceration. A 60-month sentence reflects the gravity of Joseph's conduct inside the tunnel, appropriately punishes him for false testimony to the jury under oath, and provides specific deterrence and promotes respect for the law, especially given his continued lack of remorse.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts filed in this case, ECF No. 14, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Joseph's offenses occurred inside the LWT tunnel. The government, therefore, refers the Court to Trial Exhibit 004, which is a video compilation of the timeline of events at the tunnel.

### B.    Joseph's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Joseph first attended the "Stop the Steal" rally at the Ellipse before joining the large crowd to march from the Ellipse to the U.S. Capitol. Joseph entered restricted Capitol grounds, climbed the stage on the Lower West Terrace erected for the Inauguration, and entered the LWT tunnel. Significantly, the LWT tunnel leads from the inside of the Capitol building to the stage where the President-Elect takes the oath of office. It is the same tunnel that the President-Elect emerges from on Inauguration Day. At the time Joseph entered the tunnel, he wore all black clothing, including black pants, a black jacket, black shoes, and black body-armor. He also donned a metallic gas mask and a brown tricorn-style hat. He wore his cellphone on the front of his vest, camera facing out, in the same fashion as a body-worn camera.



*Trial Exhibit 209 (Park BWC) at 3:05:50 p.m. Depicting Joseph Standing at the Entry Doors in the Tunnel in front of the Police Line*

Joseph initially entered the tunnel at approximately 3:01 p.m. Trial Ex.104 at 3:01:15. Joseph quickly made his way through the other rioters, weaving his way to the front. *Id.* at 3:01:15-3:02:10. A few minutes later, by 3:03 pm., the rioters in the tunnel, including Joseph, were pushing against the police officers and their shields. *E.g.*, Trial Ex. 104 at 3:03:27 p.m. At approximately 3:05 p.m., Joseph's co-defendant, Casey Tryon-Castro, robbed Sergeant Phuson Nguyen of his USCP riot shield.  Immediately after Tryon-Castro wrestled the shield away from Officer Nguyen, there was a brief break in fighting, which created space that would have allowed Joseph to turn

4

around. *See e.g.*, Trial Ex. 209 at 15:05:31, Trial Ex. 306 at 2:45. Instead, Joseph continued to approach the police line gesturing towards the officers with his hands, appearing to speak to the officers. *E.g.*, Trial Ex. at 306 at 2:45-2:52.

During this time, police were trying to remove an individual who was clinging to the entry door and refusing to leave, all while keeping the other rioters, including Joseph, at bay. Ex. 209 at 15:05-15:08. Notably, police were yelling commands at the rioters and deploying OC spray to keep the rioters back.  *Id.* As police continued to deal with the obstinate rioter, Joseph progressed closer to the police line. He inserted himself into the situation with that rioter and held out his hand to the rioter in an apparent effort to get him up. The rioter refused. Joseph and the other rioters then began pushing against the line. Joseph used the door to leverage himself into MPD Officer Omar Forrester, bracing himself against Officer Forrester's shield.



*Trial Exhibit 209C (Park BWC) Showing Joseph Using his Right Hand to Leverage off the Door and Pressing Against Officer Forrester's Shield*

At approximately 3:10 p.m., Joseph moved away from the police line and to the entrance of the tunnel. As he walked back to the entrance, he handed his gas mask to another rioter, who immediately joined the crowd to push against the police. Trial Ex. 312.



*Trial Exhibit 312A (Open-Source Video) Showing Joseph Handing Off His Gas Mask*

Joseph stood at the entrance of the tunnel for several seconds before turning back into the tunnel, and enthusiastically joining another push against the police. Trial Ex. 104 at 3:11:52-3:12:27. It

was this heave-ho against the police line that crushed MPD Officer Daniel Hodges between the

crowd and the door to the tunnel. Trial Ex. 308 at 20:00-22:00.



*Trial Exhibit 308 (Open-Source Video) at 21:14 Depicting Officer Hodges Crushed Between the Door and the Rioters*

After that effort against the police, Joseph exited the tunnel at 3:13 p.m. Trial Ex. 104 at 13:13;

Trial Ex. 313.



*Trial Exhibit 312A Showing Joseph Leaving Tunnel*

7

### C. Joseph's Trial Testimony

Joseph testified on his own behalf at the jury trial in this case. During his testimony, Joseph stated that he attended the "Stop the Steal" where he heard Former President Donald J. Trump speak. 6/6/2024 Trial Tr. at 130:8-12. Joseph heard Former President Trump indicate that "there was going to be more of a speech at the Capitol" and walked with the rest of the crowd to the Capitol. *Id.* Notably, Joseph did not make an impassioned decision to go to the Capitol without time to reflect on his actions. Instead, he first went to his car to respond to work emails and bought lunch. *Id.* at 130-133. Joseph admitted to entering Capitol grounds and entering the Lower West Terrace tunnel, where he saw rioters confronting police, who were trying to keep rioters from entering the building. *Id.* at 133-135.

During his testimony, Joseph made several claims that were contradicted by the evidence presented at trial, including that:

> 1) **He did not see violence prior to entering the tunnel and people appeared peaceful.**

Specifically, Joseph testified that the crowd was merely "rowdy." He added, "At the time I don't recall seeing anybody being violent." *Id.* at 133:24-25. He claimed that when he arrived at the Capitol, people were singing and talking, and vendors sold T-shirts and trinkets. *Id.* at 131:8-17.

Contrary to his testimony, at the time Joseph entered restricted Capitol grounds via the West Front, rioters had been physically battling police on the West Front for over an hour. *See* Trial Ex. 001 (USCP Montage with Timestamps). Moreover, video evidence from the tunnel shows that, at the time Joseph was about to enter the tunnel, individuals were filtering out of the

tunnel covered in OC spray and appearing disheveled. 6/6/2024 Trial Tr. at 149:20-150:18 (referencing Trial Ex. 312). Further, the surveillance footage makes clear that upon Joseph's entry into the tunnel, rioters were pushing against and confronting the police. *See* Trial Ex. 104 at 3:01.

### 2) He Was Not in the Tunnel to Cause Trouble and Was Trying to Protect the Police

In an effort to explain why he was pressed against Officer Forrester, Joseph claimed at trial that he was helping the officers and preventing someone with a cattle prod from assaulting the police. *Id.* at 141-142. He incredibly testified that, after leaving the police line and turning back into the tunnel, he wanted to continue to help the officers:

```
6   which puts the cops in an advantage.  And I just -- I mean, I
7   thought I was helping.  I had just been successful in
8   preventing an assault on the police and putting myself between
9   people who had weapons and the police, and the police were
10  able to push me forward just fine.  So I'm thinking if I can
11  give them a buffer, let them focus on pushing, they can take
12  the tunnel and nobody's going to die in here, the cop's will
13  be fine, everything will be fine, you know, no civil war is
14  going to break out like in Ukraine or Syria or Bolivia because
15  of a protest, because nobody's going to die in here today.
```

His self-serving testimony that he protected the police is belied by the video evidence showing Joseph join the crowd to push against the police, and his direct confrontation with Officer Forrester. *E.g.*, Trial Ex. 104 at 3:11:52-3:12:27, Trial Ex. 209 (Park BWC) at 13:05-08. This testimony is demonstrably false.

### 3) He Was Permitted to Be on Restricted Capitol Grounds and in the Tunnel

During cross examination, Joseph claimed that he believed he was permitted to be on restricted Capitol grounds and in the tunnel:

```
15   Q.  Okay.  And even though you saw that, you pushed your way
16   to the front of this group of rioters to be directly across
17   from the police line; right?
18   A.  I went as far as I thought I was allowed to.
19   Q.  So you thought that you were allowed to go and stand just
20   right across from the police?
21   A.  Yes.
```

Joseph's testimony that he believed he was permitted to be on restricted Capitol grounds and in the tunnel is contradicted by voluminous evidence, including but not limited to (1) Officer Summer's testimony regarding the restricted perimeter, which was marked with signs and fencing, *see e.g.*, 6/3/2024 Trial Tr. at 57-58; (2) the use of crowd control measures by the police, including munitions, which Joseph would have observed on the West Front and upon his approach to the tunnel, *see id.* at 133-34 (Summer's Testimony), 6/4/2024 Trial Tr. at 11-12 (Forrester's Testimony); and (3) the presence of police in riot gear, Trial Ex. 104, 312. By convicting Joseph on all counts, the jury necessarily rejected this false claim.

## III.    THE CHARGES

On September 6, 2023, a federal grand jury returned a Superseding Indictment, which charged Joseph with six counts, including, civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); assaulting, resisting, or impeding certain officers., in violation of 18 U.S.C. §

111(a)(1) (Count Eight); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Ten); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Twelve); engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Fourteen); and impeding passage through the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(E) (Count Sixteen). On June 10, 2024, Joseph was convicted of those offenses following a jury trial.

## IV.    STATUTORY PENALTIES

Joseph now faces sentencing on those six convictions. The statutory maximum prison sentences and fines are identified in the PSR. PSR at 1-2. Counts One, Eight, Ten, Twelve, and Fourteen each carry a three-year statutory maximum term of supervised release. *Id.* Count Sixteen carries a three-year maximum term of probation. *Id.*

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government does not agree with the Guidelines calculation set out in the PSR. Namely, the PSR declines to apply the adjustment for physical contact under US.S.G. § 2A2.4(b)(1). ECF No. 270 ¶¶ 63-81. Rather, as laid out below, the government calculates the total offense level at 24, which, when combined with a criminal history category of I, results in a Guidelines range of 51 to 63 months' incarceration.

**Count One: Civil Disorder (18 U.S.C. § 231(a)(3))**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): Physical Contact |
| Specific Offense Characteristic | +2 | U.S.S.G. § 2A2.4(b)(2): Bodily Injury |
| Cross reference | See below | U.S.S.G. § 2A2.4(c)(1) |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a): Aggravated Assault |
| Specific Offense Characteristic | +2 | U.S.S.G. § 2A2.2(b)(1): More Than Minimal Planning |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): Government Victim |
| Adjustment | +2 | U.S.S.G. § 3C1.1: Obstructing or Impeding the Administration of Justice |
| **Total** | **24** | |

**Count Eight: Assaulting, Resisting, or Impeding Certain Officers (18 U.S.C. § 111(a)(1))**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): Physical Contact |
| Cross reference | See below | U.S.S.G. § 2A2.4(c) |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense Characteristic | +2 | U.S.S.G. § 2A2.2(b)(1): More Than Minimal Planning |
| Chapter 3 Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): Government Victim |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: Obstructing or Impeding the Administration of Justice |
| **Total** | **24** | |

**Count Ten: Entering or Remaining in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2))**

| Base Offense Level | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): Restricted Area |

| Cross reference | | U.S.S.G. § 2B2.3(c)(1) |
|---|---|---|
| Base Offense Level | 14 | U.S.S.G. § 2X1.1(a) |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: Obstructing or Impeding the Administration of Justice |
| **Total** | **18** | |

**Count Twelve: Disorderly or Disruptive Conduct in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2))**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): Physical Contact |
| Cross reference | See below | U.S.S.G. § 2A2.4(c)(1) |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense Characteristic | +2 | U.S.S.G. § 2A2.2(b)(1): More Than Minimal Planning |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: Obstructing or Impeding the Administration of Justice |
| **Total** | **18** | |

**Count Fourteen: Engaging in Physical Violence in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(4))**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): Physical Contact |
| Cross reference | See below | U.S.S.G. § 2A2.4(c)(1) |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense Characteristic | +2 | U.S.S.G. § 2A2.2(b)(1): More Than Minimal Planning |
| Chapter 3 Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): Government Victim |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: Obstructing or Impeding the Administration of Justice |
| **Total** | **24** | |

13

**Count Sixteen: Impeding Passage Through Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(E))**

This offense is a Class B misdemeanor and therefore the guidelines do not apply to it. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9

Under U.S.S.G. §3D1.2, "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction . . . [or] (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline appliable to another of the counts."

Here, Group One consists of Counts One, Eight, and Fourteen charging violations of 18 U.S.C. §§ 231, 111, and 1752(a)(4), because the victim of each of these counts is the police. The highest offense level for this Group is 24. Group Two consists of Counts Ten and Twelve, charging violations of 18 U.S.C. §§ 1752(a)(1), and 1752(a)(2), because the victim of each of these counts is Congress. The highest offense level for this Group is 18. Group Two will group with Group One because Counts Ten and Twelve embody conduct that is treated as a specific offense characteristic (more than minimal planning) to the counts in Group One. §3D1.2(c). The combined offense level is 24.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Joseph used violence or the credible threat of violence against people or property during the offense. U.S.S.G. § 4C1.1(a)(3).

14

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Joseph's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. When Joseph illegally entered restricted Capitol grounds, he was dressed for violence. Joseph joined hundreds who unlawfully entered restricted Capitol grounds and entered the LWT tunnel—the location of the longest and most violent attacks against the police that day. Moreover, he knew when he entered the tunnel that rioters were attacking police and instead of turning away, eagerly weaved his way to the front of the crowd.  While inside the tunnel, Joseph engaged in multiple, coordinated pushes against police, including against Officer Forrester. The officers he heaved against were in the tunnel for hours and were physically crushed by the rioters for extended periods of time. 6/4/2024 Trial Tr. at 12-14. Officer Forrester testified that he was in pain throughout this persistent assault in the tunnel. *Id.* at 77-83. Joseph also provided his gas mask to another rioter to aid in the effort against police.

Joseph filmed it all on his cellphone—indicating that he knew a confrontation was imminent and he wanted to capture it all on film for posterity. 6/6/2024 Trial Tr. at 166:18-24. The seriousness of Joseph's conduct cannot be overstated and fully support the government's recommended sentence of 60 months' incarceration.

**B. The History and Characteristics of the Defendant**

Joseph is a 34-year-old senior systems analyst for Pacific Life Insurance Company. PSR ¶ 114. He reports that he was gainfully employed up until his conviction in this case. *Id.* ¶ 112-18. He does not report any physical, mental, or substance abuse problems. *Id.* ¶ 102-07.

Unlike many defendants that come before this Court, Joseph's criminal conduct was not the result of any mitigating circumstance, like poverty or addiction. Neither was Joseph merely a misguided follower who wandered onto restricted Capitol grounds and engaged in a crime of opportunity. Rather, Joseph came to the Capitol on January 6th dressed for battle. Despite the signs of violence in the tunnel, Joseph continued to push further inside, and made the decision to return to the front line after taking a respite from the violence.

Further, Joseph's willingness to lie under oath and his continued lack of remorse demonstrates a striking disregard for the law. In his letter to this Court, Joseph continued to sidestep responsibility for what happened on January 6th and inside the LWT tunnel. *See, e.g.*, Joseph Letter to Court at 1 ("I am writing to express my sincere remorse regarding actions on Jan 6th 2021 while attempting to exercise my constitutional rights and mitigate an emergency."). Joseph attempts to exculpate himself from liability by continuing to claim that his felonious conduct is somehow constitutionally protected. Additionally, while Mr. Joseph momentarily apologize to the officers and their families for his action on January 6th, *id.* at 1, he does a quick about face, claiming that he "stand[s] before [the Court] today as an innocent man" – despite having been convicted of several crimes by a jury of his peers. *Id.*

For all of these reasons, Joseph's history and characteristics support a sentence of 60

months' incarceration, at the high end of the Guidelines range.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Joseph's criminal conduct on January 6th was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20. Moreover, on scale, Joseph's conduct was some of the most serious on January 6th. A 60-month sentence is necessary to promote respect for the law and to reflect the seriousness of Joseph's crimes.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. As already discussed above, there are numerous factors present in this case that support a strong need for specific deterrence. Joseph arrived in Washington, D.C. dressed for a violent confrontation. Despite the events of January 6th and testimony of the officer victims, Joseph showed no remorse for his actions at trial. In fact, he testified that he was proud of his actions on the January 6th:

```
15    So I felt like I had just risked my life to help the police
16    defend our country, and I was, in that moment, kind of proud.
17    I was exhausted and everything hurt, but I felt a little
18    proud.
```

Trial Tr. at 143:15-17. Even when presented with the direct question of whether he regretted participating in January 6th, Joseph did not show remorse:

```
18    Q.  Do you regret going on January 6th?
19    A.  I mean, the smart answer is probably yes.  But at the same
20    time I feel proud that I did what I could.
21    Q.  So you're proud of what you did on January 6th?
22    A.  I'm proud of what I tried to do on January 6th.
```

*Id.* at 168:18-22. In fact, when given the opportunity to testify about whether he was ashamed of his actions, Joseph conceded that there were things he did that were "stupid", but then cited his "stupid" decision to give away his gas mask:

```
11    Q.  Okay.  Looking back now, are you ashamed of what you did
12    in the tunnel?
13    A.  I don't think ashamed would be the word I'd use, ma'am.
14    Q.  What's the word you would use?
15    A.  I think there are specific things that I did that are
16    embarrassing.
17    Q.  Like what?
18    A.  Stupid, even.
19    Q.  Like what?
20    A.  Like giving away a piece of protective equipment.  That
21    was silly.  I could have used that.  There's things I would
22    have done differently.  So like if I were to do it over, I
23    might have either brought a bullhorn or taken a bullhorn from
24    somebody else, tried to communicate with the crowd that way.
```

*Id.* at 167:11-24. After the benefit of three years to reflect on his actions and a trial with harrowing testimony from officers about how his actions affected them, Joseph does not comprehend the seriousness of his crimes. His refusal to accept responsibility continues to present day, as evidenced by his letter to this Court in support of his sentencing memorandum.

A lengthy sentence is needed to specifically deter Joseph in light of his persistent lack of remorse and failure to acknowledge his unlawful conduct.  A sentence of 60 months' incarceration will provide the strong specific deterrence that Joseph clearly requires to keep him from violating the law in the future.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

20

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[4] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The Court has already sentenced two of Joseph's co-defendant– Patrick Bournes and Benjamin Silva, both of whom received sentences of four months' incarceration and four months' home detention. But, unlike Joseph, both Bournes and Silva pleaded guilty, and did so to a single violation of 18 U.S.C. § 231(a)(3) pursuant to plea agreements with the government. Thus, they are easily distinguishable from Joseph, who was convicted of six crimes – including an assault – following a jury trial during which Joseph lied under oath. Further, Joseph's planning for January 6th was more sophisticated and his conduct more egregious, warranting a significantly higher sentence.

Joseph's trial co-defendant, Tryon Castro, is scheduled to be sentenced by his Court on November 20, 2024. Tryon-Castro's Guidelines' range is higher than Joseph's because she forcibly robbed Sergeant Nguyen of his riot shield, and the government's recommendation for Tryon-Castro is similarly higher.

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In addition to considering the sentences of his co-defendants, the Court should also consider the sentences of other similarly-situated defendants who engaged in similarly violent conduct but took their cases to trial like Joseph. Significantly, the Court has sentenced a number of other defendants who committed assaults against the police officers in the LWT tunnel, including in the cases listed below.

***United States v. Kyle Fitzsimons*, 21-CR-158 (RC).** Fitzsimons came to the U.S. Capitol on January 6th wearing a butcher costume and carrying a bow and arrow. He was inside the LWT tunnel for a shorter period of time than Joseph – only about three minutes. But during that time, he committed acts of significant violence. For example, he attempted to steal protective equipment from MPD Sergeant Nguyen, the same officer from whom Joseph's co-defendant, Tryon-Castro, stole the riot shield. Fitzsimons grabbed another MPD Sergeant and threw him to the ground, while punching another officer. Fitzsimons encouraged other rioters to fight the police as he left the tunnel.

Following trial, Fitzsimons was convicted of multiple assaults of police officers with a deadly weapon, whereas Joseph was only convicted of one count of assault. Fitzsimons also made several statements on social media or to the media claiming he was innocent and spreading disinformation. Although, to the government's knowledge, Joseph has not spread such disinformation on social media, Joseph lied under oath. This Court sentenced Fitzsimons to 87 months' incarceration. A lower sentence of 60 months for Joseph is appropriate because he was convicted of a single assault and was not convicted of violating 18 U.S.C. § 111(b), as Fitzsimons

was. A 60-month sentence still reflects the seriousness of Joseph's conduct inside the tunnel, his false testimony, and the need for specific deterrence given Joseph's continued lack of remorse.

*United States v. Jeffrey Sabol, et al.*, **21-CR-35 (RC).** In this case, the Court sentenced eight defendants who all committed assaults at approximately 4:27 p.m. at the Lower West Terrace tunnel on January 6th. Six of the eight defendants[5] were convicted of single violations of 18 U.S.C § 111(a)(1) and (b) pursuant to plea agreements with the government. Each of the defendants jointed a group assault on two police officers who were dragged out of the tunnel and into the crowd. Their conduct, on average, spanned a total of three minutes but was arguably much more violent than Joseph's actions. The Court sentenced these defendants to a range of 30 months' incarceration (defendant Mullins) to 57 months' incarceration (defendant Whitton).

Although those defendants engaged in assaultive conduct toward police in the tunnel, each accepted responsibility pursuant to a plea agreement. One of the eight defendants (Sabol) was convicted of obstruction of Congress, robbery, and assault with a deadly weapon following a stipulated trial. The Court sentenced him to 63 months' incarceration. Unlike Joseph, Sabol came to the U.S. Capitol with weapons, including a buck knife and zip ties. The last of the eight defendants to be sentenced by this Court was Ronald McAbee. McAbee, unlike Joseph, is a former law enforcement officer who wore his "Sheriff" ballistic vest to the U.S. Capitol on January 6th. He dragged an officer into the crowd, pinned that officer to the ground, and physically fought other officers who tried to help the assault victim officer. Those acts were undoubtedly more violent

---

[5] The six defendants who pleaded guilty to a violation of 18 U.S.C. § 111(a)(1) and (b) were Justin Jersey, Mason Courson, Logan Barnhart, Clayton Mullins, Jack Whitton, and Peter Stager.

than Joseph's acts in the tunnel. But unlike Joseph, McAbee entered an open plea to violations of 18 U.S.C. §§ 111(a)(1) and 231(a)(3). The Court sentenced McAbee to 70 months' incarceration. A lower sentence of 60 months would be appropriate here given the more serious conduct of McAbee compared to Joseph.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Joseph was convicted of multiple violations of offenses under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because Joseph engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

defendant responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Joseph to pay $2,000 in restitution for his convictions. This amount fairly reflects Joseph's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  FINE

Joseph's convictions subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the

27

defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Joseph's failed to return sign consent forms to U.S. Probation to determine his financial assets.  Thus, he is unable to demonstrate an inability to pay a fine. PSR ¶ 111.

## IX.     CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 60 months' incarceration, three years of supervised release, $2,000 in restitution and a $285 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   *Sarah Martin*
       _____
       SARAH MARTIN
       Assistant United States Attorney